DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MONICA LOPEZ,**
Appellant,

v.

**JOHN B. CLARKE,**
Appellee.

No. 4D12-3859

[April 1, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 502008CA028813XXXXMB.

Roy Wasson and Erin Pogue Newell of Wasson & Associates, Chartered, Miami, Law Office of David A. Hagen, P.A., Miami, and Thomas J. Gruseck, Palm Beach Gardens, for appellant.

Benjamin L. Bedard and Laura E. Bedard of Roberts, Reynolds, Bedard & Tuzzio, PLLC, West Palm Beach, for appellee.

GROSS, J.

The trial below was a tale of two former lovers—Monica Lopez and John Clarke—regarding who infected the other with the genital herpes virus. Both denied having the virus prior to their relationship. Both said they were faithful to each other. Both suffered genital herpes outbreaks—Lopez in February, 2005 and Clarke a few months later. Lopez sued Clarke and the case went to trial on claims of battery, negligence, and fraudulent concealment. The jury resolved the case in favor of Lopez, but only on the fraudulent concealment claim and for just $12,500.[1]

We reverse the judgment based on fraudulent concealment. Such fraud must be based on the tortfeasor's actual knowledge that he harbors a disease. Here, there could be no actual knowledge because Clarke secured a clean blood test from a physician a week prior to starting his relationship

---

[1] In closing argument, Lopez asked the jury to award $2,239,640.

with Lopez.  We also affirm the judgment on the defense verdicts for battery and negligence.

## *The Trial*

The trial was an ordeal.  Both parties were forced to divulge intimate details about their sex lives, medical visits, and genital ailments.  At its core, the jury was tasked with resolving three disputes.  First, whether Clarke was, in fact, infected with the herpes virus prior to engaging in sexual intercourse with Lopez.  Second, whether Clarke knew of his infection when he had intercourse with Lopez, yet failed to issue a warning.  And, finally, whether Clarke's failure to disclose resulted in Lopez contracting the herpes virus.  The case was close on each of these issues.

The trial was a battle of the experts, making a basic understanding of the herpes virus crucial to evaluating the facts.  As one expert explained, herpes is an "ancient virus[ ] that ha[s] evolved with" humans over time, "so much so that [one] can consider [it] part of the normal immune system."[2]  The virus attacks humans in two forms—"herpes simplex virus type 1, which is the causative agent of oral infections, or conditions 'above the waist'; and herpes simplex virus type 2, which is the causative agent of genital infections, or symptoms 'below the waist.'"[3]  *Mussivand v. David*, 544 N.E.2d 265, 268 (Ohio 1989).  "Both forms of the virus are life-long infections, and those infected often experience a primary episode and subsequent recurrences."  Michele L. Mekel, *Kiss and Tell: Making the Case for the Tortious Transmission of Herpes and Human Papillomavirus* Deuschle v. Jobe, 66 Mo. L. Rev. 929, 932 (2001).  Significant for a court's decision on whether or not to impose liability, "[m]ost individuals have no or only minimal signs or symptoms from infection," yet remain carriers.  Matthew Seth Sarelson, *Toward A More Balanced Treatment of the Negligent Transmission of Sexually Transmitted Diseases and AIDS*, 12 Geo. Mason L. Rev. 481, 515 n.11 (2003).

Transmission of herpes occurs "through contact with lesions, mucosal surfaces, genital secretions, or oral secretions" during periods when the carrier is "shedding" the virus.  Ctrs. For Disease Control & Prevention, *GenitalHerpes–CDCFactSheet*, http://www.cdc.gov/std/herpes/STDFact-Herpes-detailed.htm (last visited February 18, 2015).  The virus's type 2 variant—popularly known as genital herpes—is commonly "spread through sexual intercourse."  *Mussivand*, 544 N.E.2d at 268.  Once contracted, the virus takes several days to weeks to manifest—if it does at

---

[2]Although we have cited law reviews and journals, the scientific information in this opinion was divulged at trial through the expert testimony.

[3]As demonstrated in this case, one can have herpes simplex type 2 oral infections.

all—as a primary herpetic outbreak, which is typically accompanied by "one or more vesicles on or around the genitals, rectum or mouth," along with symptoms of "fever, body aches, swollen lymph nodes, and headache." Ctrs. For Disease Control & Prevention, *supra.* Thereafter, infected persons may experience subsequent recurrent outbreaks, which "tend to be milder than the initial occurrence," although the "frequency and severity of the recurrent episodes vary greatly." *Mekel*, at 933.

Pertinent to this case, two methods for detecting the herpes virus include viral cultures and blood testing. The culture method involves taking samples from suspected herpes outbreak locations, such as lesions, to evaluate the virus's presence. While a positive reading is definitive, a negative reading does not necessarily negate the possibility of infection. This is due to the virus's nature—it travels through the infected person's nervous system, occasionally revealing itself through outbreaks. Although specific outbreak locations are treatable, the overall virus is not. Thus, culture samples recovered days after the outbreak may test negative, despite a continued herpes infection, because the virus is no longer active in the previously infected region.

Blood testing, on the other hand, concerns the antibodies produced by the body to combat the virus. During a primary outbreak, the body creates IgM antibodies to function like first responders addressing an emergency. Thereafter, the body adjusts by producing IgG antibodies to suppress the virus, which remain elevated through the remainder of the infected person's life. If blood is drawn during a primary outbreak, it can result positive for IgM antibodies but not necessarily for IgG. Likewise, blood drawn during a recurrent outbreak—or during no outbreak at all—may be positive for IgG but not IgM. The choice of test, therefore, is crucial.

*The Plaintiff's Case*

Before 2000, Lopez came to the United States on a student visa, where she eventually fell in love with a fellow non-U.S. citizen. Over the years, the two resided together, engaged in unprotected sex, and intended to marry. However, they parted ways in late 2004. At trial, Lopez's partner confirmed that he did not have herpes.

Following the breakup, Lopez attended a singles party at a local doctor's home, where she met Clarke. They immediately hit it off and began seeing each other nearly every day. In February 2005, Lopez moved into Clarke's home. Concerned about some pills she observed during the moving process and some wire transfer receipts, Lopez asked Clarke whether he was engaged in other relationships or had sexually transmissible diseases (STDs). Clarke assured her that his prior partners were "clean" and that he regularly got tested for STDs, which had returned negative. This latter

representation was consistent with test results Lopez found in Clarke's car, confirming that he had recently tested negative for numerous STDs, including genital herpes.

With concerns alleviated, the couple began to engage in sexual relations.

On February 17, 2005, Lopez sustained injuries after being involved in a serious car accident. Four to five days later, she went to the emergency room complaining of difficulty urinating and vaginal swelling. As confirmed by a culture test, Lopez's gynecologist believed her symptoms to be consistent with a primary genital herpes outbreak. The doctor instructed Lopez to temporarily stop having sex and prescribed Zovirax ointment and Valtrex pills to alleviate her symptoms.

Lopez confronted Clarke about her predicament. He told her to go home and take medication. The couple continued having sexual relations. The following month, Lopez developed herpes outbreaks in other locations on her body. It took three months for her various outbreaks to subside. Since contracting herpes, she has suffered approximately six recurrent genital herpes outbreaks each year, with each outbreak lasting about five to six days.

*The Defendant's Case*

Clarke's former wife contracted genital herpes in the early 1990's. The couple continued having unprotected sex on the belief he would not contract the virus while she was not having outbreaks.

A year after divorcing, on November 8, 1999, Clarke met with his urologist who took smears from a lesion to perform a culture, which tested negative for the herpes virus. The doctor further ordered an IgG test on the belief Clarke may have been previously exposed to the virus given his relationship with the former wife; that test came up positive for herpes type 1, but negative for herpes type 2.

Over the ensuing years, Clarke visited his dermatologist for genital ailments. The dermatologist testified at trial he never observed signs of genital herpes.

On February 3, 2005, before commencing sexual relations with Lopez, Clarke returned to the urologist on account of his recurring prostatitis. While there, he decided to get tested for STDs, including the herpes virus. In so doing, the doctor administered an IgM test, which resulted negative for herpes type 2. Given the test results and lack of symptoms, the urologist determined—and continued to believe at trial—that Clarke did not have herpes type 2 at the time of the visit.

It was not until July 2005 that Clarke reported his first herpetic outbreak, a different reaction from his prior ailments. Knowing how the virus worked, Clarke used some of Lopez's Famvir to alleviate the attack before scheduling appointments with his urologist and dermatologist. When Clarke met with his urologist in August, his genital lesions had subsided. As a result of the meeting, the urologist performed blood testing, which returned positive for herpes type 2.

### Expert Testimony

The expert testimony centered upon whether Clarke contracted the virus prior to meeting Lopez. Clarke's urologist and dermatologist both confirmed their beliefs that he had not exhibited symptoms of the herpes type 2 virus prior to February, 2005. To corroborate this view, Clarke presented a specialist in the diagnosis and treatment of infectious diseases, who testified that Clarke had contracted genital herpes in July 2005, since his symptoms were "consistent with a primary herpetic outbreak" and his prior testing had shown an absence for the type 2 virus. In the specialist's opinion, it was possible Lopez was already infected and suffered a stress-induced recurrent herpes outbreak in February 2005 as a result of the car accident.

Lopez's experts focused on the reliability of the urologist's testing decisions. A virus researcher from California testified that in 1999—at the time of Clarke's positive IgG test—blood tests were unreliable for accurately differentiating between type 1 and type 2 herpes. Thus, he opined that the urologist's 1999 IgG test did not rule out the potential of a type 2 infection. Piggybacking upon this sentiment, an Ob-Gyn criticized the urologist at trial for administering an IgM examination rather than an IgG test in February 2005, since such a test would only return positive if Clarke was experiencing an outbreak, even if he was a carrier. The Ob-Gyn testified that if he were in the urologist's shoes, he would have told Clarke in 1999 that he had tested positive for herpes, but that the test could not definitively differentiate between the type 1 or type 2 variant and that he should exercise caution when engaging in sexual relations with others. The Ob-Gyn believed that Clarke had genital herpes prior to February 2005.

### The Verdict

The jury returned a verdict in favor of Lopez on her fraudulent concealment claim, but for Clarke on her claims of negligence and battery. For damages, the jury awarded a total of $12,500—$2,500 for past medical expenses, $5,000 for past pain and suffering, and $5,000 for future pain and suffering.

### *A Directed Verdict Should Have Been Entered in Favor of Clarke on the Fraudulent Concealment Claim*

We first address Clarke's argument on the cross-appeal that judgment should have been entered in his favor on the fraudulent concealment claim. Because the undisputed evidence demonstrated that Clarke lacked the intent required for fraudulent concealment, he was entitled to a directed verdict on the fraudulent concealment claim.

We reject Clarke's assertion that fraud is not a proper vehicle for asserting a claim involving the transmission of a sexually transmissible disease. The overwhelming majority of states have permitted plaintiffs in tortious transmission of STD cases to pursue recovery based on misrepresentation and fraud. *See, e.g., B.N. v. K.K.*, 538 A.2d 1175, 1182-84 (Md. 1988); *R.A.P. v. B.J.P.*, 428 N.W.2d 103, 108-09 (Minn. Ct. App. 1988); *Kathleen K. v. Robert B.*, 198 Cal. Rptr. 273, 276-77 (Cal Ct. App. 1984); *Dubovsky v. Dubovsky*, 725 N.Y.S.2d 832, 836-37 (N.Y. Sup. Ct. 2001); *Smith v. Walker*, 11 Pa. D. & C.4th 663, 665 (Pa. Ct. Com. Pl. 1991). Florida has inferentially permitted the claim; in *Hogan v. Tavzel*, 660 So. 2d 350, 352 (Fla. 5th DCA 1995), the fifth district held that a count for fraudulent concealment of an STD (genital warts) was not barred by interspousal immunity. Although *Gabriel v. Tripp*, 576 So. 2d 404, 404 (Fla. 2d DCA 1991), affirmed the dismissal of a fraudulent concealment claim involving genital herpes, it did so without discussion of how the fraud claim was pled, so its weight as authority on this issue is minimal.

As an intentional tort, fraudulent concealment requires that a defendant act with a knowing state of mind that is absent in this case. The tort of fraudulent concealment of a sexually transmissible disease requires that a defendant with knowledge of his medical condition *intentionally* fail to disclose to the plaintiff that he carries the disease. *Cf. Kitchen v. Long*, 64 So. 429, 430 (Fla. 1914) (holding that fraudulent concealment would lie where the seller of a mule, knowing of a hidden defect in a mule, "intentionally concealed" the defect from the buyer); *Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. 3d DCA 1980).

An action for fraudulent concealment of a sexually transmissible disease is almost indistinguishable from Lopez's battery cause of action. To prove a battery, Lopez was required to establish that Clarke had genital herpes, that he knew he had it, and that he fraudulently concealed the existence of the disease or misrepresented that he did not have it. *Hogan*, 660 So. 2d at 352-53. Both causes of action turned on Clarke's knowledge that he was infected with the disease. Before starting his sexual relationship with Lopez, in the very same month, Clarke consulted a urologist, was tested, and obtained what he reasonably believed was a

clean bill of health. As a matter of law, he lacked the requisite state of mind for both fraudulent concealment and battery.[4]

Finally, we affirm the judgment on the defense verdict on the negligence claim. Even applying the standard set forth in *Kohl v. Kohl*, 149 So. 3d 127 (Fla. 4th DCA 2014), Clarke's February visit to the urologist and the testing that was done would preclude Lopez from establishing that he had constructive knowledge that he carried the disease. Negligence law imposes liability where a defendant has actual or constructive knowledge that he is infected with an STD. *Id.* at 135-36. Constructive knowledge typically arises from the "existence of obvious symptoms." *Id.* at 136. One purpose of negligence law in this area is to encourage people to react to their symptoms and seek medical treatment. Where a person has sought medical treatment and obtained a clean bill of health, the imposition of negligence liability is not appropriate.

*Reversed and remanded for the entry of a judgment for the defendant.*

CONNER and KLINGENSMITH, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

---

[4]We note that the trial court's instruction on fraudulent concealment improperly expanded the tort of fraudulent concealment of a sexually transmissible disease. The court instructed the jury that one element of the tort was that Clarke made a false statement concerning a material fact *relating* to genital herpes. This instruction would have made Clarke liable for making false statements about the medical condition of his first wife or risky, promiscuous dating behaviors, factors that increase the risk that a person could contract genital herpes. In this type of case, the umbrella of the intentional tort of fraudulent concealment is narrow; it requires both a defendant's knowledge that he has contracted a sexually transmissible disease and the intentional act of failing to disclose it to a sexual partner. The tort does not open the door to liability for concealing more general facts about dating history.